Docket No.: 24-cv-10630-MJJ

I.W., an individual,

    Plaintiff,

    v.

CHOICE HOTELS INTERNATIONAL, INC.

    Defendant

## PLAINTIFF'S FIRST AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff I.W. ("Plaintiff" or "I.W."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. Plaintiff is a survivor of human sex trafficking.

2. I.W.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation in Choice's hotels.

3. I.W. was trafficked from 2016-2018. Through coercion, threats and force, her trafficker moved her from location to location, where she experienced forced use of alcohol, drugs, and violence. Her trafficker forced her to engage in sex acts with strangers for money. Ultimately her trafficker came to control every aspect of her life. The defining factor of the relationship between I.W. and her traffickers, was that many nights, I.W.'s traffickers forced her to have sex with men for money in Choice's hotel rooms.

4. I.W. was trafficked in hotels owned, managed, controlled, and / or supervised by

1

**Defendants Choice Hotels International, Inc.** ("Choice") and **Phoenix Hotel, LLC** ("Phoenix") (together, "Defendants"). Phoenix is the franchisee of Choice's Rodeway Inn at which I.W. was trafficked. Upon information and belief, Phoenix chose this commercial venture with Choice because of Choice's reputation and its commitment to helping its franchisees engage in successful business, by following Choice's guidance as set forth, inter alia, its policies, procedures, standards, and contractual obligations. The relationship is one with potential profit and risk.

5. I.W.'s traffickers rented hotel rooms for one purpose—to engage in sex trafficking.

6. At Choice's Rodeway Inn, I.W. was forced to engage in sex with strangers every day. Every new customer was another instance I.W. was forced to have sex against her will—that is to say, I.W. was raped by multiple men, sometimes many times per day, when she stayed at Choice's hotel.

7. I.W.'s trafficker forced her onto Choice's branded property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under the threat and infliction of physical and psychological abuse.

8. I.W. escaped the grasps of her traffickers and the imprisonment at Choice's branded hotel rooms.

9. I.W. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of being trafficked.

10. I.W. seeks to hold accountable those who harbored her traffickers and profited from what they knew or should have known was her trafficking .

**OVERVIEW OF TRAFFICKING**

11. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

12.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

13.     Choice knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

14.     Rather than taking timely and effective measures to stop profiting from this epidemic, Choice chose to ignore the open and obvious presence of sex trafficking on their branded properties, continuing to benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose from regular trafficking by familiar traffickers.

15.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including Choice, makes millions from participating in ventures that they know or should have known engaged in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship with the potential for profits and losses, fueled by the sexual exploitation of victims.

16.     Choice and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

Choice's own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project and ECPAT both created for the use of the hospitality industry.

17. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Choice shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Choice and other industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

18. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Massachusetts Attorney General, the Ohio Attorney General, the Texas Attorney General, Love 146, the United States Department of Transportation, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[2]

---

[2] United States Department of Homeland Security Blue Campaign – *One Voice. One Mission. End Human Trafficking*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023); U.S. Department of Transportation, *Indicators of Human Trafficking* https://www.transportation.gov/stop-human-trafficking/indicators (last visited December 10, 2024); Ohio Attorney General, *Human Trafficking Initiative*, https://www.ohioattorneygeneral.gov/Individuals-and-Families/Victims/Human-Trafficking (last visited December 10, 2024); Massachusetts Attorney General's Office, *LEARN THE SIGNS OF LABOR TRAFFICKING*, https://www.mass.gov/doc/learn-to-recognize-the-signs-of-labor-trafficking/download /. (last visited January 16, 2025).

19. Widely recognized signs of sex trafficking, which can be observed by hotel staff of which all Defendants were made awarefrom these organizations, include but are not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control or possession of money or ID;

h. Individuals dress inappropriately for their age, for the weather, or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items – such as no luggage or other bags;

j. Individuals appear to be with significantly older "boyfriend" or in the company of older males;

k. A group of girls appear to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" including (but not limited to) GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Crack Cocaine, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as attire, condoms, birth control, or

lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or usage of large amounts of cash or pre-paid cards.[3]

20. The signs of sex trafficking in a hotel environment follow well-established patterns and are easily detectable by appropriately trained staff. Various organizations have developed human trafficking "tool kits", which help hotel staff in every position identify and respond to signs of sex trafficking.[4] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

21. Choice's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of I.W. on their properties.

22. I.W. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems — failed." https://polarisproject.org/national-survivor-study/

23. I.W. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors like I.W. pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 Choice knowingly benefited from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a). owned, managed, controlled, and / or supervised

---

[3] *Id.*

[4] *E.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited December 10, 2024).

## PARTIES

24.     Plaintiff I.W. is a natural person and a resident and citizen of Massachusetts.

25.     Plaintiff is a victim of trafficking pursuant to 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a.  Due to the sensitive and intimate nature of the issues, Plaintiff I.W. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Choice maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[5]

    b.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[6] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[7] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[8]

    c.  Good cause can also include the ongoing threats of violence common in sex trafficking ventures.

---

[5] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[6] Fed. R. Civ. P. 10(a).

[7] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[8] Fed. R. Civ. P. 26(c).

d. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[9]

f. Moreover, Choice will not be prejudiced. Plaintiff will agree to reveal her identity to Choice for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Choice will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

26.    **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.   Choice is incorporated in Delaware, with its headquarters in Rockville, Indianapolis. It can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, OH 43221.

27.    All times relevant hereto Choice owned, supervised, managed, controlled, and / or operated the day to day activities at Rodeway Inn, located at 1005 Belmont Street, Brockton,

---

[9] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Massachusetts 02301 ("Choice's Brockton Rodeway Inn"). Choice had day-to-day control over Choice's Brockton Rodeway Inn through enforcement of its brand standards, franchise agreement and Choice's ability to unilaterally terminate the franchise agreement with Choice's Brockton Rodeway Inn for non-compliance with its contractual obligations .

a. Choice's Brockton Rodeway Inn is a Choice brand property.[10]

b. Through Choice's enforcement of the contractual agreements with its franchisee Choice's Brockton Rodeway Inn Phoenix, Choice controlled nearly every element of operations at Choice's Brockton Rodeway Inn. Therefore, Choice is liable directly, vicariously, and / or indirectly through an agency relationship for the acts and / or omissions of the employees at its branded hotels, including Choice's Brockton Rodeway Inn where I.W. was trafficked.

c. Choice maintained a joint enterprise and was a joint employer with Phoenix Hotel LLC ("Phoenix"). Choice would be treated as a single employer under federal statutes like Title IX and the Fair Labor Standards Act.

d. Choice controlled and maintained performance standards related to how employees did their jobs, what the job duties were for employees on the ground at hotels. Choice controlled the daily operation of Phoenix by specifying minute detailed requirements in the operation manual. The manual regulates identification, advertising, front office procedures, cleaning and inspection service for guest rooms and public areas, minimum guest room standards, food purchasing and preparation standards, requirements for minimum supplies of "brand name" goods, staff procedures and standards for soliciting and booking

---

[10] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

group meetings, functions and room reservations, accounting, insurance, engineering and maintenance, and numerous other details of operation.

e. Choice measured performance of Phoenix and set standards for compliance.

f. Choice controlled the instrumentalities at issue in this case. Specifically, Choice set forth standards related to safety, security, and criminal activity. Choice had authority to implement rules and procedures related to safety, security, trafficking, and other criminal activity.

g. Choice has an actual and apparent agency relationship with Phoenix /Choice's Brockton Rodeway Inn as to establish vicarious liability. Choice monitored and managed Phoenix's performance with respect to running the Brockton Rodeway Inn. Choice was able to ensure that Phoenix complied with systems, policies, and procedures by penalizing Phoenix for infractions, all the way up to termination of the franchise agreement if Phoenix did not run the Brockton Rodeway Inn in the manner which Choice dictated.

h. A reasonable person based on the facts and circumstances would conclude that Phoenix and its employees were agents of Choice.

i. Through these highly detailed brand standards, policies, and procedures, Choice controlled, managed, and directed the actions and inactions of Choice's Brockton Rodeway Inn.

j. Choice maintained control of the day to day operations of the Phoenix Rodeway Inn through highly detailed brand standards, policies, procedures, and systems. Choice total control over the duties and responsibilities and qualifications0 of employment at Choice's Brockton Rodeway Inn. In light of this control, Choice

hired, employed, controlled, and / or managed employees at Choice's Brockton Rodeway Inn.

k. Such control extended to nearly every element of operations at Choice's Brockton Rodeway Inn.[11] This control, either directly, vicariously, or indirectly, establishes liability for the acts and/or omissions of Choice at its branded hotels, including Choice's Brockton Rodeway Inn where I.W. was trafficked.[12] .

l. Choice knowingly benefited, or received something of value, from its commercial business ventures at Choice's Brockton Rodeway Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where I.W. was trafficked.

m. Choice also benefitted from maintenance of a public positive image of the Choice's Brockton Rodeway Inn, notwithstanding the ongoing human trafficking.

n. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including I.W. and its traffickers, used for advertising / internet optimization in the marketing of Choice's brand properties.

o. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, contracting to supply services in Massachusetts. Choice has

---

[11] For more detailed allegations, please look at the section titled "Choice's Control Over Their Brand Hotels" in this First Amended Complaint.

[12] *See*, *e.g.*, *Revenue Management*, Choice, https://neo.choiceuniversity.net/sections/revenue-management-sales/revenue-mgmt/ (last visited January 16, 2025) (providing training to franchisees on "maximize prices and revenues").

derived substantial revenue from services rendered in Massachusetts and from Massachusetts citizens, reaching into the jurisdiction in numerous ways. It is reasonable and expected to hale Choice into Court in Massachusetts.

p. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

28. **<u>Defendant Phoenix Hotel LLC</u>** ("Phoenix") is a Limited Liability Company located at 1005 Belmont Street, Brockton, MA 02301. It can be served through its agent Ashok I. Bhojwani, who resides at 1005 Belmont Street in Brockton, MA 02301.

29. Phoenix was the Franchisee of Chase's Brockton Rodeway. Belmont Street in Brockton, MA 02301. Phoenix entered into a franchise agreement with Choice for Choice's Brockton Rodeway Inn and all other contractual requirements to have the privilege of using the Choice brand, engaging in a joint venture for the common business purpose of benefiting, with the risk of failure.

a. The subject of the franchise agreement between Choice and Phoenix, Choice's Brockton Rodeway Inn, is located in the District of Massachusetts.

b. Phoenix was subject to the reporting requirements in the Franchise Agreement of Choice, as well as subject to Choice's brand standards.

c. Phoenix helped open Choice's Brockton Rodeway Inn.

d. Phoenix earned revenue from Choice's Brockton Rodeway Inn in the District of Massachusetts

e. Phoenix communicated back and forth with Chase in the District of Massachusetts.

f. Phoenix was required to purchase insurance for Choice's Brockton Rodeway Inn in the District of Massachusetts.

### JURISDICTION AND VENUE

30. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

31. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").re

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendant Choice.

### FACTUAL BACKGROUND

### INTRODUCTION

33. I.W. brings her claims against Defendants for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

34. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591 and thereby establishes a non-delegable duty of reasonable care.

35. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[13] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the

---

[13] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754 /.

hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

36. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Choice generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties—despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Choice did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

37. Through both its policies and procedures which brand hotels were required to follow or otherwise face termination, as well as direct control otherwise given to Choice in their franchise agreements, Choice willingly turned a blind eye to human trafficking that they knew or should have known was occurring on their properties.

38. Upon information and belief, Choice kept no reports or data on incidences or occurrences of human trafficking or suspected incidences or occurrences of human trafficking on their properties, including where I.W. was trafficked, and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Choice did not establish mandatory and secure reporting mechanisms at the point of sale.

39. Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Choice did nothing in the face of the human sex trafficking epidemic in their industry. Instead, Defendants continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex

trafficking.

40. Choice thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Choice failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

41. With little to no risk posed to traffickers seeking to use Choice's rooms as a location to force victims like I.W. to engage in commercial sex against her will, the sex trade continues to thrive at Choice's branded properties while Choice reaps the benefits.

42. Phoenix was the franchisee and owner of the property of Choice's Brockton Rodeway Inn while Plaintiff was trafficked.

43. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

44. Plaintiffs' injuries are mental, emotional, and psychological in nature and derive from the trafficking period. A trafficking period is ongoing and continuous subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for injuries such as those suffered by Plaintiff.

45. Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory, non-compensatory, and punitive damages incurred during their trafficking period. 18 U.S.C. §1595(a).

**THE SEX TRAFFICKING OF PLAINTIFF I.W.**

46. I.W. was held against her will and sex trafficked from 2016 through 2018 (the "trafficking period"). In addition to other hotels, I.W. was subjected to sex trafficking at Choice's Brockton Rodeway Inn located at 1005 Belmont Street, Brockton, MA 02301 from 2016 to 2018.

47. By means of a combination of force, fraud, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities including, but not limited to, food, water, transportation, shelter, and clothing, I.W. was held captive and sold for sex at Choice's Brockton Rodeway Inn by her traffickers.

48. During the time that she was trafficked, I.W.'s traffickers frequently rented rooms at Choice's Brockton Rodeway Inn because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with I.W. The relationship between the traffickers, Choice, and the Rodeway Inn was continuous and obvious, and Choice knew or should have known about it because Choice required its franchisees to abide by state and federal law, among other things.

49. Throughout her trafficking, I.W.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Craigslist advertising for I.W.'s availability for commercial sex. I.W.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Choice's managed Wi-Fi at Choice's Brockton Rodeway Inn.

50. I.W. was forced to have sex with multiple "johns" almost every day she was trafficked at Choice's Brockton Rodeway Inn.

51. During the time she was trafficked, I.W.'s traffickers utilized the same hotel, Choice's Brockton Rodeway Inn, repeatedly at intervals.

52. While at Choice's Brockton Rodeway Inn, I.W.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding basic necessities all to ensure that she could not escape.

53. During her captivity at Choice's Brockton Rodeway Inn, I.W. was raped,

continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

54. At the above-listed hotel, I.W. encountered the same staff on multiple occasions. The Choice's Brockton Rodeway Inn staff saw signs of I.W.'s abuse brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of the Choice's Brockton Rodeway Inn property as well as signs of malnutrition and poor health. Choice's control over the day-to-day operations of the Rodeway Inn, its training, and reporting of the daily activities shows that Choice either turned a blind eye to the sex trafficking of I.W. by failing to do anything about the reported incidents from its franchisee or failing to implement any effective training so the staff knew what to do when the obvious sex trafficking of I.W. occurred in full view of staff. On one occasion at Choice's Brockton Rodeway Inn, I.W. and her trafficker were checking into the hotel when she overheard the trafficker requesting a specific room location to better facilitate the venture. Those rooms were reserved through Choice's reservation system. The franchisee was prohibited from using any other reservation platform.

55. I.W. was trafficked at Choice's Brockton Rodeway Inn by Choice in intervals of one to two days per occasion, at least ten different times; however, in each case, she was still under the permanent captivity of her trafficker. Every time she stayed at the hotel, a minimum of five "johns" came through the hotel to purchase sex.

56. On one occasion, while her trafficker was out, I.W. went to the front desk and asked for new room keys to keep the trafficker from reentering the room. When he came back to the hotel and his key no longer worked, he openly and obviously broke in through a ground floor window. Hotel staff did not intervene or call law enforcement, as if they were familiar with who he was.

57. On multiple occasions, I.W. was subjected to verbal and physical abuse, including the throwing of furniture. The loud abusive, destructive noise was never investigated by hotel staff and law enforcement never notified. I.W.'s traffickers, in general, were very violent at Choice's Brockton Rodeway Inn and on multiple occasions physically abused her: her loud screams were often audible from the room.

58. Upon information and belief, the staff also had access to security camera footage documenting the constant stream of buyers from cameras placed throughout the hotel. Through information and belief, Choice had access to the security camera footage and would have seen the trafficking of I.W. if it had followed any reasonable measure to ensure its guest safety at the Rodeway Inn.

59. Further, with each stay at Choice's Brockton Rodeway Inn, it resulted in several consistent red flags, including, but not limited to:

a. Paying for stays in cash;

b. Paying for extended stays on a day-by-day basis;

c. Requesting a room away from other guests;

d. Obvious signs of illegal drug use;

e. Frequent requests for linen changes;

f. Unusually large number of used condoms in the trash;

g. Unusually large number of male visitors asking for I.W. and her traffickers at the front desk;

h. Visible signs of prior and private physical abuse;

i. Unusually large number of male visitors coming in and out of the room;

j. Loud noises of abuse or other emergency audible to staff or other rooms; and

k. Loitering and soliciting on hotel grounds.

60. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Choice's Brockton Rodeway Inn. Monitoring, training, implementing and measuring policies as Choice did in all other areas of its requirements for franchising opportunities and Choice would have easily known it was profiting from I.W.'s trafficking. Choice purposed chose profits over the safety of I.W.

61. These red flags, as well as those established by other organizations as stated in this Amended Complaint, were open and obvious to anyone working at the Rodeway Inn by Choice.

62. On multiple occasions, I.W. asked Choice's Brockton Rodeway Inn's hotel staff for help, going so far as to make them aware of sex trafficking occurring on the property.

63. Every time I.W. interacted with Choice's Brockton Rodeway Inn's staff, it was readily apparent that I.W. was under the control of her traffickers.

64. I.W.'s traffickers followed a repetitive and routine procedure during stays at Choice's Brockton Rodeway Inn and Defendants knew or should have known of I.W.'s trafficking because of a variety of factors detailed below:

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING
AT THEIR LOCATIONS**

65. Choice is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[14] The United Nations,[15] international non-

---

[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[15] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

profits,[16] and the U.S. Department of Homeland Security,[17] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Choice cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

66.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

67.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[18] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[19] These efforts sought to educate both the

---

[16] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[17] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[18] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime /.

[19] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone /.

public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

68. Choice, on information and belief, has access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Choice nevertheless does not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

69. Choice, on information and belief, monitors public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

70. Choice also monitors social media for their branded locations.

71. Choice monitors hotel reviews across its branded hotels. Choice actively engaged third party vendors to extract complaints and reviews across the country. One vendor Choice use was medalia. Medalia gathered data in meaningful reports for Choice. Medalia reported to Choice what customers had said regarding the hotel and broke down a score in relation to the sentiment in complaints and reviews. Choice and Phoenix had access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking. Choice monitored guest complaints for a number of different reasons. Choice did not, however, actively monitor complaints specifically for activity that would identify trafficking. Medalia frequently pulled complaints and reviews from the internet rife with complaints and reviews related to criminal activity, commercial sex, ad trafficking, Choice did nothing with that data when it received it from Phoenix.

72.    A brief examination of just a handful of examples of news, reviews, and social media for Choice suffices to show the extraordinary frequency with which Choice has long received and continue receiving evidence and reports that human trafficking and other forms of criminal activity runs rampant at Choice's Brockton Rodeway Inn:

   a.   Regarding a stay in March 2018 at the Brockton Rodeway Inn by Choice, a hotel customer wrote one-star review saying, "There's definitely a drug dealer who is in some kind of thing with the staff [cause] he sits around and sells drugs outside all day and night. I know he's dealing drugs because he is very obvious about it."

   b.   Regarding a stay in September 2017 at the Brockton Rodeway Inn by Choice, a hotel customer wrote a one-star review saying, "lots of shady characters around."

   c.   Regarding a stay in April 2020 at the Brockton Rodeway Inn by Choice, a hotel customer wrote a one-star review saying, "I overheard a drug deal in the lobby while I was waiting to check out…*someone who can do something with this place should feel a moral responsibility to do so*." (Emphasis added)

73.    Further, there are a large number of reports of prostitution at other Rodeway Inns and Choice Branded hotels across the country which Rodeway Inn monitored, including before and during the trafficking period.

74.    A brief example of just a handful of examples of news, reviews, and social media suffices to show the extraordinary frequence which Choice has long received and continued to receive evidence and reports of human trafficking and other forms of criminal activity runs rampant at their branded locations.

a. In 2017, the Delaware Department of Justice declared the Newark Rodeway Inn off of South College Avenue a criminal nuisance due to the motel's persistent problem with police, prostitution, drug sales, drug use, and sexual assaults.[20] From 2013 to 2017, police were called over 900 times.[21] Several media outlets reported this news story.

b. On May 29, 2013, a woman was arrested on prostitution charges for promoting prostitution at a Rodeway Inn in Fairview Township, Pennsylvania.[22]

c. On December 10, 2013, a man and two women from New York were arrested in a prostitution sting at a Rodeway Inn in Allentown, Pennsylvania[23]

d. On October 28, 2018, three people were charged with felony prostitution or promoting prostitution, as well as dealing with cocaine, at a Rodeway Inn located in Fort Wayne, Indianapolis.[24]

e. On January 27, 2017, four men were arrested for human sex trafficking at a Rodeway Inn located in Sioux City, Iowa.[25]

f. On July 19, 2017, three suspects were arrested in a prostitution ring at a Rodeway Inn located in Tyler, Texas.[26]

[20] Department of Justice Press Releases, *Department of Justice Complaint Leads Court to Declare Newark Motel a Criminal Nuisance Property*, State of Delaware, https://news.delaware.gov/2017/08/31/ri/ /. (August 31, 2017).

[21] *Id.*

[22] Jeffrey A. Johnson, *Undercover investigation leads to prostitution arrest in Fairview Township*, Penn Live, https://www.pennlive.com/midstate/2013/05/undercover_investigation_leads.html /. (May 29, 2013)

[23] Sarah Cassi, *Pimp, 2 prostitutes busted in sting at Allentown motel, police say*, Lehigh Valley Live, https://www.lehighvalleylive.com/allentown/2013/12/man_two_women_busted_in_prosti.html /. (December 10, 2013).

[24] Jamie Duffy, *Sting nets prostitution arrests*, Associated Press, https://apnews.com/article/arrests-58fdfa86b9374a2e99eb1c294c1facec /. (October 28, 2017).

[25] Josie Cooper, *FOUR CHARGED IN PROSTITUTION STING (UPDATE)*, KSCJ, https://kscj.com/2017/01/27/sioux-city-prostitution-sting-sends-four-jail/ /. (January 27, 2017).

[26] Kris Kirst, *2 arrested in prostitution ring, Tyler police searching for additional suspect*, KHOU 11, https://www.khou.com/article/news/local/texas/2-arrested-in-prostitution-ring-tyler-police-searching-for-additional-suspect/285-457901742 /. (July 19, 2017).

g. Regarding a stay at a Rodeway Inn in Maryland, one reviewer stated in 2015: "I booked this room online fur one night for a event in the area..beaded on previous review I thought it would be alright just for the night. BOY WAS I WRONG. There was a long line of people trying to check in. Most of the people that were checking in seemed like drug addicts or prostitutes. During the wait 3 people that checked in came back inside and asked for their money back. They even had a problem with GERMAN SHEPARD on the 3rd floor like someone left it there. Room was not cleaned at least to my standards so had to get money back."[27]

h. Regarding a stay at the Comfort Inn in Independence, Ohio, one reviewer stated on February 2012: "I guess you could enjoy this hotel if you'd enjoy having noisy neighbors or being surrounded by woman that look like hookers and men that look like pimps. . . this was each night I was there, 4 days...And this happened each night I was there, at all hours the night and early morning. I didn't feel safe leaving my room after 8 pm. You'll hear cars outside your windows basting theit radios and have their bass cranked.. loud TV's all around you. Slamming doors, yelling on the hallways late at night.. I had a woman that had a warrant staying in the room next door to me. Management didn't seem to care when complaints were made. The police were called finally after my neighbors got into a screaming match. I barely sldot. . ."[28]

i. Regarding a stay at the Rodeway Inn in Clear Water Florida, one reviewer

---

[27] Tripadvisor, "GHETTO & Probably Prostitution Here", https://www.tripadvisor.com/ShowUserReviews-g4274735-d120951-r292445897-Rodeway_Inn-Milford_Mill_Maryland.html /. (last accessed January 16, 2025).
[28] Tripadisor, "Never stay here again unless you're a enjoy hookers!", https://www.tripadvisor.com/ShowUserReviews-g50470-d95403-r124787932-Comfort_Inn_Independence-Independence_Ohio.html /.

stated in 2019: "The room had a foul stench. There were hairs in between the sheets, in the sink and in the tub. Half a roll of tissue paper, no soap or shampoo. There was a pill of some kind sitting ontop of the dirty (inside) microwave. I went to the front desk to ask for another room and was told they had no other available rooms for me since I used my rewards points and cash to get said room. I travel with my own cover and pillow so I used them to sleep on and left them there and bought new the next day. During the evening I was approached by 3 different women who asked if I had 20 dollars and wanted to "party" as they showed me they "didn't have track marks". Then approached by a Male who asked if I wanted any "weed, coke or pills" then said if I wanted to "get down with his b!+ch" I could if I had 50 bucks and a rubber. I returned to the front desk and the new clerk told me that there would be no refund and I should either "stay in my room" or "go find another hotel". In my 20 plus years of traveling with work I have never been more disgusted with an establishment. DO NOT STAY HERE . . ."[29]

75.     Even though Choice monitored these hotel reviews, news reports, social media, and other public records, Choice failed to implement proper policies and procedures to prevent human trafficking on their properties, while still continuing to profit on the human trafficking that it knew or should have known was occurring on its franchised properties, including where I.W. was trafficked.

---

[29] Tripadvisor, "Disgusting hotel. Filled with prostitutes and addicts", https://www.tripadvisor.com/ShowUserReviews-g34141-d84259-r686846719-Rodeway_Inn_Clearwater_Largo-Clearwater_Florida.html /.

## CHOICE'S FAILURE TO IMPLEMENT POLICIES
## FACILITATED THE TRAFFICKING OF I.W.

76.     Choice is a signatory of the Code[30] and thereby has promised to adopt policies to combat trafficking. Yet, Choice has failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

77.     Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards, policies, and procedures for implementation, mandates, and operations, but also enforced them.

78.     Choice profited from the sex trafficking of Plaintiff I.W. Choice rented rooms to and provided Wi-Fi to I.W.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where I.W. was trafficked. The hotel staff, especially front desk staff and cleaning staff, at Choice's property knew or should have known of the obvious signs of I.W.'s trafficking.

79.     Choice benefited from the steady stream of income that I.W.'s traffickers and "johns" bring to their hotel brands. Choice profited from each and every room that I.W.'s traffickers and customers rented where I.W. was harbored and maintained for the purpose of sex trafficking. In addition, Choice profited from data collected each and every time I.W.'s traffickers and customers used Choice's Wi-Fi to advertise and solicit I.W. for commercial sex.

80.     Choice has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Choice should have been

---

[30] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members ./

aware of the benefits they were receiving from the human trafficking occurring at the location where I.W. was trafficked given Choice's access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

81. Moreover, Choice repeatedly collected data on I.W., her traffickers, and her "johns" from her many stays at Choice's hotel, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Choice's employees witnessed the obvious signs of I.W.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Choice failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Choice would have taken proper measures, Choice would have identified the trafficking of I.W., and could have taken steps to ensure it did not profit from harboring I.W. and other victims like her being trafficked at their locations.

82. Choice discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where I.W. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

83. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the property where I.W. was trafficked and reported this to Choice or

would have if Choice did not fail to implement reasonable policies and procedures it says it promulgated.

84. In addition, Choice had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

85. Choice failed to take any steps to stop reaping the benefits of sexual exploitation on its properties. Choice maintained its deficiencies to maximize profits by:

    a. Failing to mandate training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b. Failing to analyze the data Choice received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to enact a system that does not profit from participation in venture.

    d. Failing to refuse room rentals, or report guests to law enforcement engaged in sex trafficking and pimping, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to exercise the same degree of control over systems related to Human Trafficking that it did over systems governing other parts of operations and safety. Instead, it ignored intentionally decided not address the sex trafficking epidemic occurring in Choice hotels. Failing to utilize its power as a parent company, to hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

86. As a direct and proximate result of these egregious practices on the part of Choice, I.W. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

87. On the other hand, as a direct and proximate result of these egregious practices on the part of Choice, Defendants have made significant revenues.

88. Choice participated in a venture of renting rooms that were used to harbor Plaintiff. Knowingly profiting from renting rooms used for the purpose of harboring sex trafficking violates the TVPRA's criminal statute. And if Choice knew the money it made came from renting room's where Plaintiff was harbored and forced to engage in commercial sex acts, then that would violate both the criminal and civil provisions of the TVPRA.

### CHOICE'S CONTROL OVER THEIR BRAND HOTELS FACILITATED THE TRAFFICKING OF I.W.

89. It is a standard practice in the hospitality industry, followed by Choice, for Parent Hotel Corporations to set exacting brand quality standards.

90. Choice provides its branded properties with signage on and in front of the building

29

intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. Through Choice's intellectual property licensed to franchisees, Choice's brand names gives their branded properties name recognition. No provision of the Lanham Act provides Choice with protection from its duties to comply with the TVPRA.

91. As a part of the franchise agreement and the licensing of Choice's intellectual property, Choice controls nearly every single aspect of their franchisees, in order to, in part, maintain that brand recognition. This is done not only through the implementation and enforcement of operating procedures and policies, but also through immediate, direct control and / or management given to Choice over several aspects of their franchised hotels' day to day operations.

92. As a part of its franchise agreements, Choice reserves the right to unilaterally terminate the franchise agreement should the franchisee demonstrate non-compliance with these procedures, policies, and direct control and / or management sections of the franchise agreements.

93. The termination of the franchise agreement leads to shutting down of that brand hotel.

94. Therefore, Choice controls, manages, and / or operates the brand hotels through enforcement of its own defined policies and procedures standards. But more than that, Choice's franchise agreements gives Choice direct management over several significant aspects of the brand hotels' day to day operations. Non-compliance with these forms of control and / or management leads to termination and the subsequent shutting down of the business.

95. The aforementioned forms of control give Choice control over nearly every single aspect of its franchised hotel locations.

96. Choice exercised day-to-day control over Choice's Brockton Rodeway Inn through centralized corporate systems it requires franchisees to use to engage in business, training, policies, and brand standards. Choice implemented control over the Choice's Brockton Rodeway Inn as either a direct subsidiary or under the terms of its franchise agreements.

97. Choice did not just profit from human trafficking in a tangential way by unknowingly selling services and / or goods to human traffickers. Rather, Choice **knowingly**, with actual and / or constructive knowledge, rented hotel rooms to sex traffickers and earned revenue.

98. As a part of their franchise agreements, Choice directly controls the hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are controlled by Choice. Choice oversees booking and reservation trends, including the branded hotel where Plaintiff was trafficked.[31]

99. As a part of its franchise agreements, Choice directly controls the marketing of its branded hotels, to the point that its branded hotels cannot even put up a road sign without Choice's permission.

100. Choice exercises significant control over their brand hotels, down to managing the size, materials, and brands used in their brand hotels' architecture, infrastructure, utilities, and amenities. Choice requires their franchisees to comply with these brand standards or otherwise face termination, as the agreements (including at the Rodeway Inn) grant Choice the unilateral

---

[31] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

right to terminate franchise agreements.

101.     Upon information and belief, Choice requires its branded hotel properties to use a property management system, which is linked to Choice's corporate network and data center, for, among other things, receiving reservations and processing credit card transactions.

102.     Upon information and belief, per the relevant franchise agreements,[32] Choice enforces its brand standards by means of periodic inspections of its brand hotel locations ensuring compliance with those brand standards.

103.     Upon information and belief, Choice's brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

104.     Choice also exercises significant control over sex trafficking the employment decisions of their hotel locations, including but not limited to their enforcement of brand standards (which are employees are bound by). Choice's policies, procedures, and standards include (but are not limited to) the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay.

105.     As seen by citations herein to Choice's websites, each shares or co-determines those matters governing the essential terms and conditions of employment.  Choice sets the essential terms and conditions of employment, including hiring, training, retention, advancement, and setting rates of pay. Specifically, Choice create and promulgate policies relating to training employees to recognize and respond to human trafficking, and Choice determine whether such training shall be mandatory.

---

[32] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs /.

106. Choice requires its franchised hotel employees to attend training sessions to ensure compliance with brand standards.

107. Choice regularly communicates with the managers and employees of its franchised hotel locations, often issuing directives to ensure brand quality compliance.

108. Under federal labor law regulations, Choice is considered a joint employer of the employees at Choice's Brockton Roadway Inn.

109. Plaintiff further alleges that, as a result of the relationship between Defendants and their branded properties, including at Choice's Brockton Roadway Inn, Choice jointly controlled the terms and conditions for staff with Phoenix, making Defendants joint employers. The factors that support these significantly include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Red Roof's right to terminate franchise agreements with their branded properties for failure to comply with these requirements. Therefore, Choice retained control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

110. Choice regularly controls, manages, and / or monitors revenue and cash flow data at its franchised locations as a part of their franchise agreements obtained through room rentals and hotel amenities such as food services.

111. Choice supplies food, utensils, branded supplies, branded merchandise, and other products to its franchised locations as a part of its franchise agreements. Choice monitors customer complaints and reviews, often taking steps at its franchised locations to remedy these complaints and reviews to maintain Choice's brand quality recognition.

112. Choice employees will often visit franchised hotel locations within the scope of

their employment to advance brand quality control.

113. Despite their knowledge that few, if any, employees at their hotel locations actually receive human trafficking training if the same are not mandated, Choice failed to mandate such training on any significant scale or at Choice's Brockton Rodeway Inn where Plaintiff was trafficked.

114. On information and belief, Choice require its hotel locations to pay approximately 10% of gross revenue back to Choice for the privilege of using Choice's names and following their brand standards.

115. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Choice's property management system;

    b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c. Requiring branded locations to keep audit reports and other records;

    d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e. Providing marketing requirements and standardized marketing services for the branded locations;

    f. Regulating all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

    g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from making substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[33]

116. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[34]

117. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[35]

118. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[36]

119. Choice controls all hotel reservations made across its branded locations on its

---

[33] *See, e.g.*, Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/ /.
[34] *See, e.g., Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[35] *Id.*
[36] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

centralized reservation system called Choice Edge.[37]

120.     Through its national sales team, Choice controls the credit processing system and centralized direct billing at its brand hotels, including Choice's Brockton Rodeway Inn. [38]

121.      Upon information and belief, Choice also manages and / or controls their franchised locations' Wi-Fi, collecting customer Wi-Fi data Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for marketing and profit optimization, as well as guest safety reasons.[39]

122.     Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain Cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

123.     Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[40]

124.     Choice requires branded properties to comply with its own corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[41]

125.     All this management gives Choice  unfettered control and oversight over its

---

[37]  *Supra* n 101

[38] *Id.*

[39] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

[40] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[41] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

franchised locations.

126. Choice's acts, omissions, and commissions, taken separately or together as outlined above, demonstrate that Choice knew or should have known that I.W.'s human trafficking was occurring at Choice's Brockton Rodeway Inn.

127. Rather than implementing forms of quality control, policies, procedures, or terminating the franchisee location per their contractual right to do so, Choice continued to earn substantial revenue from human trafficking occurring at Choice's Brockton Rodeway Inn, profiting from human trafficking occurring at that location.

128. Especially in light of the aforementioned amount of control over employment which Choice held over the property, Choice hired, employed, and managed staff at Choice's Brockton Rodeway Inn who had knowledge, constructive and / or actual, of the sex trafficking at Choice's Brockton Rodeway Inn during the trafficking period.

## DEFENDANTS FACILITATED PLAINTIFF I.W.'S SEX TRAFFICKING

130. Defendants harbored and facilitated the providing, maintenance, and exploitation of I.W. at Choice's Brockton Rodeway Inn when it continued to provide rooms where I.W. was imprisoned and exploited despite actual knowledge of or willful blindness to the fact that I.W. was being trafficked there.

131. Defendants participated in a "venture" (as defined by the TVPRA) by earning revenue through room rentals to sex traffickers and collecting Wi-Fi data from sex traffickers, who were using those room rentals for sex trafficking (which defendants had knowledge of). Defendants engaged in a common undertaking that consisted of potential profit and loss. Defendants also engaged in a continuous relationship with I.W.'s trafficker who used the safety of Choice's Rodeway Inn to traffick I.W.

132. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at Choice's Brockton Rodeway Inn, Defendants continued renting rooms to be used in sex trafficking, providing traffickers with a safe haven, and operating Choice's Brockton Rodeway Inn in a way that enabled and facilitated sex trafficking activity.

133. Defendants knew or should have known about the activity that resulted in I.W. being trafficked.

134. Defendants facilitated widespread trafficking at Choice's Brockton Rodeway Inn in ways including, on information and belief:

    a. developing relationships with multiple traffickers, including Plaintiff's trafficker, and creating an understanding that this trafficker could operate at the hotel without risk of interference;

    b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

    c. accommodating specific requests made by traffickers;

    d. serving as lookouts for traffickers;

    e. leaving doors unlocked or ajar for the benefit of the traffickers;

    f. providing traffickers with master keys or keys to external building doors;

    g. accepting bribes from the traffickers;

    h. allowing traffickers to check in without showing identification;

    i. observing Plaintiff and other victims in obvious distress but continuing to provide support to her trafficker;

    j. allowing "johns" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

k. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

l. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

m. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

n. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

135. Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

136. Defendants knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

137. Plaintiff incorporates each foregoing paragraph as if incorporated herein.

138. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

139. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

140. Defendants benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

141. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Choice's Rodeway Inn.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Respectfully submitted,
The Plaintiff,
I.W.,
By her attorneys,

*/s/ Michael V. Glennon*
Michael V. Glennon, BBO# 678977
BRODY, HARDOON, PERKINS & KESTEN, LLP
265 Franklin Street, 12th Floor
Boston, MA 02110
(617) 880-7100
mglennon@bhpklaw.com

DATED: January 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Michael Glennon*
Michael Glennon

DATED: January 17, 2025